Argued and submitted December 20, 2019, reversed and remanded
March 16, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSE ANTONIO AVILA,
aka Antonio Avila,
*Defendant-Appellant.*

Umatilla County Circuit Court
CR150856; A167346

507 P3d 704

This case involves the giving of what is known as the "*Miles* instruction," which tells the jury in a DUII case that a defendant whose "physical condition" makes that defendant "more susceptible to the influence of intoxicants" and who becomes "under the influence by a lesser quantity of intoxicants than it would otherwise take," is nevertheless under the influence of intoxicants. UCrJI 2708; *State v. Miles*, 8 Or App 189, 196-97, 492 P2d 497 (1972) (the genesis of the instruction in Oregon). The state requested the instruction because defendant has muscular dystrophy, which the state argued is a physical condition that made him more susceptible to the effects of alcohol. On appeal, defendant contends that it was error to give the instruction because there was no evidence in the record to establish that muscular dystrophy makes a person more susceptible to the influence of alcohol and because a permanent condition like muscular dystrophy cannot justify a *Miles* instruction. *Held*: The Court of Appeals traced the history of the *Miles* instruction and expressed doubt as to whether it is ever appropriate outside the context of drugs or medications that make the defendant more susceptible to the effects of alcohol; the court also observed that UCrJI 2708, when given in conjunction with UCrJI 2701 (addressing what it means to be "under the influence of intoxicants"), introduces a degree of confusion and circularity. However, the Court of Appeals concluded that, in any event, the trial court erred in giving the instruction because there was no evidence that defendant's muscular dystrophy actually made him any more susceptible to the influence of alcohol than someone without that condition. Because defendant's convictions were based on the theory that he drove while under the influence of intoxicants, and the instruction misled the jury on that central issue, the instructional error was not harmless.

Reversed and remanded.

Daniel J. Hill, Judge.

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

This case involves the giving of what is known as the "*Miles* instruction," which tells the jury in a DUII case that a defendant whose "physical condition" makes that defendant "more susceptible to the influence of intoxicants" and who becomes "under the influence by a lesser quantity of intoxicants than it would otherwise take," is nevertheless under the influence of intoxicants. UCrJI 2708; *State v. Miles*, 8 Or App 189, 196-97, 492 P2d 497 (1972) (the genesis of the instruction in Oregon). The history of the *Miles* instruction, which is entirely a product of our case law, without comment by the Oregon Supreme Court, is a cautionary tale regarding the crafting of jury instructions, and it exemplifies the problems that ensue when instructions are crafted from short snippets of court opinions. As discussed below, the phrase "physical condition," as it appears in the *Miles* instruction, was drawn from a Texas case from the late 1930s that involved the combined effects of drugs and alcohol; and for the past half century, it has spawned uncertainty about the proper scope of the *Miles* instruction—specifically, whether it applies to a "physical condition" beyond one created by drugs or medications that make a defendant more susceptible to the influence of alcohol.

In this case, the instruction was given because defendant has muscular dystrophy, which the state argues is a physical condition that made him more susceptible to the effects of alcohol. As explained below, we have grave doubts as to whether a *Miles* instruction is ever appropriate outside the context of drugs or medications that make the defendant more susceptible to the effects of alcohol; but, in any event, the trial court erred in giving the instruction in this case, because there was no evidence that defendant's muscular dystrophy actually made him any more susceptible to the influence of alcohol than someone without that condition. We therefore reverse and remand.

Because our disposition turns on defendant's claim of instructional error, we confine our discussion to the factual and procedural history bearing on that issue.[1] Defendant

---

[1] Defendant also raises assignments of error regarding the admissibility of evidence about his performance on a horizontal gaze nystagmus (HGN) test and

was charged with one count of driving under the influence of intoxicants and one count of reckless driving (also on the theory that he drove while intoxicated).[2] At trial, defendant testified that he had muscular dystrophy and asthma. He testified that muscular dystrophy affects his movements, balance, and breathing, and that it has caused him to fall and makes it difficult to grasp things with his hands. According to defendant, his symptoms first appeared when he was 15 or 16 years old and have advanced over time. He argued that the symptoms he exhibited when pulled over were caused by muscular dystrophy, not the beers he had consumed.

Defendant also called a physician, Dr. Fahey, to testify about the effects of muscular dystrophy. Fahey testified that muscular dystrophy is a genetic disease that causes muscles to become weak and "not work correctly." Fahey testified that it can affect walking, coordination, and the ability to perform basic tasks.

On cross-examination, the state elicited testimony about the effects of alcohol on someone with muscular dystrophy. The prosecutor and Fahey had the following exchanges:

"Q.   Okay. So would somebody with muscular dystrophy, would it be—would the consumption of alcohol have a worsening or positive [e]ffect on their motor skills?

"A.   It would be a worsening on their motor skills.

"Q.   Okay. And could someone with muscular dystrophy have a worsening of their general motor skills *as compared to someone without muscular dystrophy with a lesser amount of alcohol*?

"A.   *I think the impairment and the neurological part would be the same. It would impair someone without. It*

_____

challenging the court's imposition of a fine and court-appointed attorney fees. Because we reverse and remand defendant's convictions based on his claim of instructional error, we do not address those remaining assignments. We recognize that questions concerning admissibility of the HGN evidence are likely to arise on remand, but not in the same posture as defendant's present challenges, which involve preservation issues and the adequacy of the foundation laid by the state.

   [2] Defendant was also charged with one count of refusal to take a test for intoxicants, which was dismissed.

*would impair somebody with. I think if you already have muscular dystrophy, it's an additive effect.*

"Q.  Okay. So when you say impairment would be the same, in other words, the body would process—I guess I don't understand. You say that there would be an additive effect. What I'm really trying to ask here, and perhaps I'm not asking this with clarity, but if someone without muscular dystrophy consumes alcohol, is there going to be a greater diminished motor skill [e]ffect as compared to someone who has muscular dystrophy?

"A.  Mm-hmm.

"Q.  In other words, is the person with muscular dystrophy and they're consuming alcohol going to have an even greater lack of motor skill ability?

"A.  I don't—okay. I think—what I was trying to say is additive, because it affects the neurological part, where the muscular dystrophy is at the muscle. So the muscle—the neuromuscular junction doesn't—isn't changed any way by alcohol, but the neurological part is. And it's across the board, you would have that neurological effect.

"Now, could that be additive, yes. To the—you add the neurological component to the neuromuscular junction, then you have additive effect. Does that make sense?

"\* \* \* \* \*

"Q.  Someone without muscular dystrophy driving a vehicle without alcohol as the standard. Is a person with muscular dystrophy who is driving a vehicle with the weakening of the muscles, is that person's ability to drive a vehicle using motor skills going to be rate—affected to a greater degree with the use of alcohol as compared to someone without muscular dystrophy?

"A.  I—yeah. *I—it will affect them just like it affects a person without muscular dystrophy. I think if you have the neurological coordination problem with the already pre-existing muscular dystrophy problem, then you have an additive effect.* That's what I'm trying to say.

"\* \* \* \* \*

"Q.  *So is there a difference between alcohol consumption and motor skill use with someone without muscular dystrophy in the same persona with muscular dystrophy*?

"A.  *Yeah. I—it adversely affects both, and if you're already having a hard time, that would make it even harder time.* And that makes—

"Q.   Okay. And a harder time, you're referring to motor skills?

"A.   Yes."

(Emphases added.)

Based on defendant's and Fahey's testimony, the state requested UCrJI 2708, the *Miles* instruction. That instruction states:

"If you find from the evidence that the defendant was in such a physical condition, that the defendant was more susceptible to the influence of intoxicants than he otherwise would be, and as a result of that physical condition, the defendant became under the influence by a lesser quantity of intoxicants than it otherwise would take, the defendant is nevertheless under the influence of intoxicants."

The prosecutor explained that his understanding of Fahey's testimony was that "there was an additive effect of the alcohol to someone with muscular dystrophy," and that Fahey had said that "someone with muscular dystrophy with—I think he said with problems or with those issues, referring to motor skills, would be greater affected by the alcohol. And that was in response to my question about the amount of alcohol, the lesser quantity."

Defendant objected to the instruction, explaining that his understanding was that the *Miles* instruction ordinarily applied in cases "where someone who has taken a certain medication is more susceptible to alcohol because that affects the same system of the body as does the alcohol." And, defendant argued, Fahey had not testified that alcohol affects a person with muscular dystrophy any differently. Rather, Fahey had testified "that alcohol affects an entirely different system of the body than he was referring to the neuromuscular versus the neurological—and that—so a person wouldn't be any more susceptible to the influence of alcohol itself."

The trial court gave this instruction, explaining: "We have the statements of his medical condition from

himself. And then we have the doctor's testimony regarding the additive effects of alcohol upon muscular dystrophy, which is what the defendant describes himself as having." Thus, the court concluded that the *Miles* instruction was appropriate, and it delivered the instruction to the jury. Defendant was found guilty of DUII and reckless driving.

On appeal, defendant argues that the trial court erred in giving the *Miles* instruction in the context of a permanent physical condition like muscular dystrophy, but that, in any event, the evidence did not show that muscular dystrophy made defendant any more susceptible to the influence of alcohol. Rather, defendant argues, the "additive effect" described by Fahey was that any impairment from alcohol would be added to defendant's existing impairment from muscular dystrophy. The state, in response, defends the giving of the instruction, arguing that a genetic disease can support the giving of a *Miles* instruction, and that "this case fits squarely within the parameters of the *Miles* instruction" in that "[t]he alcohol would be more impairing to someone with defendant's physical condition than it would be to someone without that condition, and therefore, the person may be impaired by a lesser quantity of the alcohol."

The accuracy of the trial court's instructions to the jury presents a question of law. *State v. Guzek*, 358 Or 251, 277, 363 P3d 480 (2015). "We review the instructions as a whole in determining whether a trial court erred by giving a particular instruction and whether the instruction accurately stated the law." *Id.* Generally speaking, a party "is entitled to a jury instruction on its theory of the case if the requested instruction correctly states the law, is based on the operative pleadings, and is supported by the evidence." *State v. Williamson*, 214 Or App 281, 285, 164 P3d 315, *rev den*, 343 Or 554 (2007).

The critical legal questions in this case—whether UCrJI 2708 correctly states the law and whether the evidence in this case supported giving it—require some historical context. As we telegraphed at the outset, the development of the *Miles* instruction has been a case study in the risks attendant to drawing jury instructions from short snippets of opinions, a practice that the Supreme Court and

this court have long discouraged. *See, e.g.*, *Ireland v. Mitchell*, 226 Or 286, 294, 359 P2d 894 (1961) ("[I]t is not advisable in charging the jury to use the exact words of an appellate court opinion in stating the law in similar cases."); *Sherertz v. Brownstein Rask*, 288 Or App 719, 725 n 2, 407 P3d 914 (2017) ("Jury instructions drawn from short snippets of opinions pose challenges." (Citing *Amfac Foods v. Int'l Systems*, 294 Or 94, 99 n 3, 654 P2d 1092 (1982) (noting that appellate opinions are often "written with no view" that they will be turned into instructions).)).

The genesis of the instruction in Oregon, *Miles*, is notably short on facts and legal analysis. The defendant in *Miles* had been charged with violating *former* ORS 483.992(2) (1971), *repealed by* Or Laws 1975, ch 451, § 291 (1975), which provided:

"Any person who, while being under the influence of intoxicating liquor, dangerous drugs or narcotic drugs, drives any vehicle upon any highway, street or thoroughfare within this state, shall be punished, upon conviction, by imprisonment in the county or municipal jail for not more than one year, or by fine of not more than $1,000, or both."

Rather than set out any background facts relating to the charge, we jumped directly to the assignments of error. With regard to the relevant assignment of instructional error, this was the sum of our discussion:

"Finally, defendant's tenth assignment attacks the state's requested instruction which was directed to defendant's testimony that his condition was the result of pills he had been taking for a stomach ailment. The challenged instruction was as follows:

"'If the defendant was in such a physical condition that he thereby was more susceptible to the influence of intoxicating liquor than he otherwise would have been, and by reason thereof was under the influence from the recent use of alcoholic liquor, he would be in the same position as though his being under the influence was produced by the alcoholic liquor alone.'

"'A defendant who is in a condition whereby he may become under the influence of a lesser quantity of

alcohol tha[n] it would ordinarily take is, nevertheless, under the influence of intoxicating liquor. ***'

"The above instruction was clearly applicable to the case in view of defendant's testimony that he had been taking medication and that the pills impaired his normal mental and physical faculties; the instruction was a correct statement of the law. *See Kessler v. State*, 136 Tex Cr 340, 125 SW2d 308, 309 (1939); *Harrell v. City of Norfolk*, 180 Va 27, 21 SE2d 733, 735-36 (1942). *Cf. State v. Evans*, 1 Or App 282, 460 P2d 1021 (1969)."

Given the brevity of our discussion, the only clue as to the reasoning as to why the instruction was a "correct statement of the law" is its string cite relying primarily on two out-of-state cases. And the first of those cases, *Kessler*, was not only persuasive authority but *the source* of the instruction requested in *Miles*.

The defendant in *Kessler* had been charged with driving while intoxicated, and she testified at trial that "during the day she took several tablets of amytal but did not remember drinking any whisky," and her husband and a doctor both testified "that amytal was a sedative and was given to quiet people and cause them to go to sleep. That it has the same effect as whisky." 125 SW2d at 309. The defendant requested an instruction "to the effect that if she was intoxicated on the night in question from the combined use of amytal and whisky to acquit her." *Id*. The court rejected that argument, explaining that combined intoxication was still intoxication:

"If she indulged in the use of amytal to such an extent that she thereby made herself more susceptible to the influence of intoxicating liquor than she otherwise would have been and by reason thereof became intoxicated from the recent use of ardent spirits, she would be in the same position as though her intoxication was produced by the use of whisky alone. *A person who gets himself in a condition whereby he may become intoxicated from a lesser quantity of whisky than it would ordinarily take to produce intoxication is nevertheless intoxicated from the use of whisky*."

*Id*. (emphasis added). On rehearing, the court further explained that "[t]he proposed charge would authorize an acquittal of one charged with 'drunk driving' if such driver

was under the *combined influence of drugs and whisky* regardless of the state of mind resulting from such use. This is not the law." *Id.* at 310 (emphasis added).

The state's requested instruction in *Miles* was cribbed directly from the court's reasoning *rejecting* the defendant's proffered instruction in *Kessler*. In other words, the proffered instruction in *Miles* flipped the *Kessler* analysis around. In doing so, not only did it turn a hypothetical factual scenario involving combined use of drugs and alcohol into a proposed rule of law, it took some of the language out of context, untethering the "conditions" from the physical condition *resulting from drug use* that was at issue in *Kessler*. On its face, the selective quotation from *Kessler* simply applies to a person "who is in a condition whereby he may become under the influence of a lesser quantity of alcohol," regardless of the source or nature of that condition. *Compare Miles*, 8 Or App at 197 ("'A defendant *who is in a condition* whereby he may become under the influence of a lesser quantity of alcohol than it would ordinarily take is, nevertheless, under the influence of intoxicating liquor.'" (Emphasis added.)), *with Kessler*, 125 SW2d at 309 ("A person *who gets himself in a condition* whereby he may become intoxicated from a lesser quantity of whisky than it would ordinarily take to produce intoxication is nevertheless intoxicated from the use of whisky." (Emphasis added.)). Despite the seemingly broad reference to "physical condition" in *Miles*, there is nothing else in *Miles* itself to suggest that we were endorsing an instruction that would apply outside the specific context before it—the combined use of drugs and alcohol.

First, the other cases in the *Miles* string cite, *Harrell* and *Evans*, involved questions of the combined effects of alcohol and other drugs or ingested chemicals. In *Harrell*, the defendant had been charged with violating a Norfolk, Virginia, ordinance making it unlawful to drive "while under the influence of alcohol * * * or while under the influence of any other self-administered intoxicant or drug of whatsoever nature." 21 SE2d 733. A dentist testified that he had treated the defendant a couple of days before his arrest for an impacted wisdom tooth and had given him an envelope of pills containing nembutal, which was

phenobarbital and aspirin and which the dentist described as "an hypnotic." *Id.* at 735. The dentist testified that the drug makes "one sleepy, that it had an effect on the appearance of the eyes, and, as it caused a general drowsiness, it also affected the speech." *Id.* The dentist further testified that in many respects the outward effect of the drugs was the same as someone being drunk, and he testified that "the more medicine taken, the greater would be its effect." *Id.*

On the request of the city's counsel, the trial court gave the following instruction:

> "The Court instructs the jury that if they believe from the evidence in this case beyond a reasonable doubt that the accused at the time in question, operated an automobile while under the influence of both whiskey and the pills he had taken, they should find him guilty."

*Id.* The defendant on appeal challenged the giving of that instruction, but the court, pointing to the reasoning in *Kessler*, held that a person under the influence of *both* pills and alcohol is still under the influence of the alcohol:

> "While it is true that there was no request for an amendment of the warrant to include a violation of the ordinance for driving an automobile while under the influence of a self-administered drug, this issue was presented by the testimony of the defendant. Whether the defendant, while driving the automobile in question, was under the influence of intoxicants, under the influence of a self-administered drug, or under the combined influence of both whiskey and the nembutal pills, was purely a question of fact to be determined by the jury. *The instruction merely told the jury that if they believed from the evidence, beyond a reasonable doubt, that the defendant was under the influence of 'both whiskey and the pills he had taken*, they should find him guilty.'"

21 SE2d at 735 (emphasis added).

*Evans*, the only Oregon citation of the three, also involved concurrent causes of intoxication—specifically, carbon monoxide poisoning and liquor. The defendant had claimed that the headache and nausea he experienced while driving, and his erratic driving, were caused by carbon monoxide poisoning from fumes that leaked into his car rather

than the two beers that he had consumed. 1 Or App at 283. He argued that the jury should have been instructed as follows:

> "'The defendant has introduced evidence that the physical condition described by the arresting officer was caused by carbon monoxide poisoning.'
>
> "'If after a careful consideration of all of the evidence in the case, there remains in your mind a reasonable doubt as to the cause of the defendant's condition, that is whether or not it was caused by the consumption of alcoholic liquor, or by carbon monoxide poisoning, then the defendant is entitled to the benefit of the doubt and you shall find him not guilty.'"

1 Or App at 283-84.

We rejected the defendant's argument on the ground that the instruction misstated the law. We explained that the "vice of the requested instruction" was its "implication that intoxication and carbon monoxide poisoning are mutually exclusive," which did not allow for the "the possibility of defendant's having been affected by both." 1 Or App at 284.

Second, *Miles* itself involved the same type of "physical condition" that was at issue in *Kessler*: the combined use of pills and liquor. We stated that the instruction was merited because of the "defendant's testimony that he had been taking medication and that the pills impaired his *normal* mental and physical faculties." 8 Or App at 197 (emphasis added).

Thus, although *Miles* approved an instruction that was worded ambiguously regarding its scope because of how it had cribbed from *Kessler*, there is nothing in the text of *Miles*, or in the cases it cites, to suggest that it was approving of the instruction outside the context of specific "physical conditions"—that is, those involving the combined effects of alcohol and other drugs.

Our earliest opinions referring to the "*Miles* instruction" involved that narrow context of drugs and alcohol. *See, e.g.*, *State v. McKenna*, 67 Or App 662, 664 & n 1, 679 P2d 346 (1984) (rejecting, by way of a footnote, the defendant's argument that it was error to give the *Miles* instruction where

the defendant "admitted that he had consumed some beer and that he was taking medication that his doctor had told him not to mix with alcohol"); *State v. Kennedy*, 95 Or App 663, 665, 668-69, 771 P2d 281 (1989) (declining to reach, on preservation grounds, a challenge to the giving of the *Miles* instruction where the defendant used "Eskalith, a form of lithium carbonate" on the day in question).

Then, in *State v. Huck*, 100 Or App 193, 197 & n 4, 785 P2d 785 (1990), we pointed out a significant question left open by *Miles*: What evidentiary foundation is necessary to establish the nexus between the defendant's condition and alcohol use for purposes of an instruction on susceptibility? By the time we decided *Huck*, the *Miles* instruction had become a Uniform Criminal Jury Instruction (then numbered UCrJI 2706 rather than its current UCrJI 2708). The defendant in *Huck* argued that the *Miles* instruction should only be given when there is evidence of susceptibility. We agreed and explained that there was no evidence in the record that the drug in question (Vicodin, in that case) "made defendant more susceptible to the effects of alcohol than he otherwise would have been." *Id.* at 197. We explained that, in the absence of such evidence, the instruction has the potential to confuse the jury by suggesting that a drug "made defendant more susceptible to alcohol and that there was evidence to that effect when, in fact, there was no evidence of that sort." *Id.*[3]

Then, in *State v. McFeron*, 166 Or App 110, 116, 999 P2d 470 (2000), we explained that intervening changes to Oregon's DUII statutes further restricted the circumstances in which the *Miles* instruction should be given.[4] Cases like

---

[3] *Cf. State v. Anderson*, 117 Or App 495, 498, 844 P2d 923 (1992) (rejecting a challenge to the giving of the *Miles* instruction where there was evidence that the defendant's antischizophrenic medication (serentil and lithium) made him more susceptible to the effects of alcohol); *State v. Stiles*, 165 Or App 584, 589 n 3, 998 P2d 703 (2000) (noting that "[t]he state did not assert that defendant's marijuana use made him more 'susceptible' to the effects of alcohol" and had expressly acknowledged that it failed to establish the foundation for a *Miles* instruction).

[4] In *McFeron*, 166 Or App at 117 n 2, we noted the expansion from *Miles* to UCrJI 2706:

"[W]hile the *Miles* instruction informed the jury about the basis for determining that the defendant was driving under the influence of *intoxicating liquor alone*, UCrJI 2706 is not similarly constricted. Rather, UCrJI 2706

*Miles* and *Huck* had involved circumstances in which the "physical condition" was having taken drugs, but those cases arose before the enactment of ORS 813.010(2) in 1991, which imposed a pleading requirement in the case of DUIIs for being under the influence of a controlled substance. The statute provided:

> "A person may not be convicted of driving while under the influence of intoxicants on the basis of being under the influence of a controlled substance unless that the fact that the person was under the influence of a controlled substance is pleaded in the accusatory instrument and is either proved at trial or is admitted by the person through a guilty plea."

As we explained in *McFeron*, that statutory change was significant and limited the circumstances in which the *Miles* instruction should be given. At the time of *Miles* and other DUII cases involving the combination of drugs and alcohol, the statutes did not require "the state to identify upon which of the three bases—intoxicating liquor alone, controlled substances alone, or intoxicating liquor and controlled substances combined—a defendant was charged and convicted." 166 Or App at 117. But, after the enactment of ORS 813.010(2), the state "may not present evidence that the defendant's ingestion of controlled substances rendered him or her more susceptible to the alcohol" unless the state has pleaded that theory. 166 Or App at 118. Consequently, "[p]ermitting the state to couch the material contribution or the intoxicating effects of controlled substances as a 'physical condition' for *Miles* purposes would violate the express terms of ORS 813.010(2), render that provision meaningless in a large number of DUII prosecutions and thereby contravene the intent for its adoption." *Id.* at 118-19.

In clarifying the scope of the holding in *McFeron*, however, we perhaps breathed new life into the ambiguity about the meaning of "physical condition" as the term was used in *Miles*. In describing the types of underlying "physical

---

permits a finding that a defendant is under the influence of 'intoxicants' where the defendant's physical condition makes the defendant more susceptible to the influence of 'intoxicants,' which includes either or both intoxicating liquor and controlled substances."

(Emphasis in *McFeron*.)

conditions" that could support the giving of a *Miles* instruc-
tion, we used imprecise language:

> "In so holding, we emphasize that we do not question *Miles*'
> continuing validity where the underlying 'physical con-
> dition' *was not the product of the ingestion of a controlled
> substance* and, obviously, the state may pursue a *Miles*
> theory based on the defendant's ingestion of a controlled
> substance so long as the accusatory instrument conforms
> to ORS 813.010(2). The original citation here simply failed
> to do so."

166 Or App at 119 (emphases added). There are, of course,
drug-related conditions that are not "the product of the
ingestion of controlled substances"—for instance, over the
counter medication that might interact with alcohol—but
the meaning of the sentence is not entirely clear.

        The consequences of that ambiguity, spawned in
*Miles* from a snippet of *Kessler*, surfaced soon after in *State
v. Roller*, 181 Or App 542, 47 P3d 52 (2002), and *State v.
Curtis*, 182 Or App 166, 47 P3d 929, *rev den*, 335 Or 104
(2002). In *Roller*, the defendant contended that the symp-
toms observed by the arresting officer were the product of
the flu, not alcohol consumption, and he offered testimony
by an expert who opined that "the flu can cause a nystag-
mus when the ears become stopped up." 181 Or App at 544.
The state proposed giving UCJI 2706, over the defendant's
objection "that there was no evidence that he was in a phys-
ical condition that rendered him more susceptible to the
influence of intoxicants." *Id.* at 545. Similarly, in *Curtis*, the
trial court gave the *Miles* instruction over the defendant's
objection that there was no evidence that his fatigue was a
"physical condition" that rendered him more susceptible to
the influence of intoxicants. 182 Or App at 168.

        In both cases, we ultimately agreed with the defen-
dants that it was error to give the *Miles* instruction, but on
the ground that there was a lack of evidence that suffering
from the flu or being fatigued made a person more suscep-
tible to the effects of alcohol. *Roller*, 181 Or App at 546;
*Curtis*, 182 Or App at 171. We neither endorsed nor rejected
the premise that the flu or fatigue—as opposed to the
kind of drug-induced susceptibility at issue in *Kessler* and

*Miles*—were the types of "physical conditions" that would support the giving of a *Miles* instruction.

Over the past two decades, we have similarly reversed the giving of a *Miles* instruction in three other cases involving "physical conditions" other than drugs. *See State v. Gibbs*, 193 Or App 296, 297, 89 P3d 1215 (2004) (reversing after the giving of a *Miles* instruction where the record did not include any evidence that the defendant's severe head trauma made him more susceptible to the influence of alcohol); *State v. Massey*, 249 Or App 689, 692, 278 P3d 130 (2012), *rev den*, 353 Or 203 (2013) ("Specifically, there is no evidence that defendant's physical condition, attributable to either his medication or his fatigue, rendered him more susceptible to the effects of alcohol."); *State v. Basham*, 301 Or App 498, 503, 456 P3d 658 (2019), *rev dismissed*, 366 Or 761 (2020) ("Looking to the physical conditions advanced before the trial court—defendant's prior injuries and tiredness—the record contains no evidence tying those conditions to an increased susceptibility to the effects of an intoxicating substance. Giving the *Miles* instruction in the absence of such evidence was likely to mislead the jury and is, therefore, reversible error.").[5]

From that 50-year lookback at the *Miles* instruction, three things are evident. First, the phrase "physical condition" was imported from *Kessler* without context and without any analysis of the text of our DUII statutes or the way that Oregon courts had interpreted what it means to be "under the influence of intoxicants." Even at the time that *Miles* was decided, the term "physical condition" was a part of the test for being intoxicated—but it was the endpoint, not the beginning of the inquiry. In *State v. Robinson*, the court had interpreted *former* ORS 483.992 this way:

"This statute is designed, through the punishment of offenders, to deter persons from driving on the public highways when they have voluntarily allowed their physical coordination and mental faculties to become hampered and

---

[5] On two other occasions, we also accepted concessions of error by the state in cases involving pain medication, where the state failed to offer evidence that the medication made the defendant more susceptible to the effects of alcohol. *State v. Berning*, 262 Or App 587, 588, 325 P3d 811 (2014); *State v. Rich*, 259 Or App 655, 656, 314 P3d 979 (2013).

dulled by intoxicating liquor. *The test whether a motorist is driving under the influence of intoxicating liquor is not his fitness or unfitness to drive an automobile but, rather, whether he has imbibed to an extent that his mental and physical condition is deleteriously affected.* In this condition he increases the danger of accident that already inheres in the movement of automobiles in increasing numbers on our highways."

235 Or 524, 531, 385 P2d 754 (1963) (emphasis added).

That same meaning of "under the influence" has since carried through to our current statutes,[6] and it is reflected in the uniform jury instruction for what it means to be "under the influence of intoxicants," UCrJI 2701. That instruction, which was given in this case, provides:

"Oregon law provides that it is not unlawful for a person to drive a vehicle after having consumed intoxicating liquor. It is unlawful, however, for that person to drive a vehicle if the person is under the influence of intoxicating liquor.

"In this case, you do not have to find that [defendant's name] was drunk or intoxicated, as those terms are commonly understood. 'Under the influence of intoxicating liquor' means that [defendant's name]'s *physical or mental faculties were adversely affected by the use of intoxicating liquor to a noticeable or perceptible degree.*

"'Under the influence of intoxicating liquor' includes not only the well-known and easily recognized conditions and degrees of intoxication, but *also any abnormal mental or physical condition that results from consuming intoxicating liquor and that deprives the person of that clearness of intellect or control that the person would otherwise possess.*"

(Emphases added.)

That, of course, is not how *Miles* and UCrJI 2708 use the term "physical condition." They refer to the defendant's "physical condition" *without* the alcohol—a physical condition that creates susceptibility to intoxication. That alone introduces some degree of circularity and confusion,

---

[6] *See State v. Guzman*, 366 Or 18, 46, 455 P3d 485 (2019) (citing *Robinson* and stating that "[t]he 'perceptible degree' standard has been part of our law for close to a century").

whereby a jury is asked to determine whether the defendant "was *in such a physical condition*" and "*as a result of being in that physical condition*" became intoxicated by a lesser amount of an intoxicating liquor, UCrJI 2708, which can be determined from "any abnormal mental *or physical condition that results from consuming intoxicating liquor,*" UCrJI 2701. In other words, under the uniform instructions, both given here, the intoxication can be the result of the defendant's physical condition, and the defendant's physical condition can be the result of the intoxication.

Second, although we have perhaps assumed as much for the sake of argument, we have never once held that a defendant's "physical condition" other than having taken drugs or medication supports the giving of a *Miles* instruction, much less held that a permanent physical condition like muscular dystrophy could support it. Apart from the circularity regarding "physical condition" in the current uniform jury instructions, we have grave doubts that a *Miles* instruction would ever be appropriate when the "physical condition" is something other than a temporary condition caused by the ingestion of a drug, and especially where the physical condition is a permanent physical impairment. There are certainly standards for being a licensed driver, and basic standards for operating a vehicle safely, but it should go without saying that Oregon law does not make it a crime for a physically impaired person to drive a vehicle. Oregon's DUII law criminalizes driving when a person's physical or mental faculties have been adversely affected by the use of an intoxicant to a perceptible degree. *State v. Mazzola*, 356 Or 804, 813, 345 P3d 424 (2015). The physical impairment must be the result of the intoxication, not the result of a preexisting condition that is noticeable apart from the use of an intoxicant. One risk of a *Miles* instruction in the context of a condition like muscular dystrophy is that it will erode that distinction and invite the jury to evaluate the defendant's fitness or unfitness to drive rather than the degree to which impairment of the defendant's physical or mental faculties are caused by, and are perceptible as a result of, an intoxicant.

That brings us to a third and related observation about the *Miles* instruction, and the one that is ultimately

dispositive here. Beginning with *Huck*, our cases have required the state to present evidence of a condition that makes the defendant more susceptible to the influence of the intoxicants, not evidence of a condition that results in a greater degree of impairment than would be experienced by a person without that condition. The record in this case includes evidence that an intoxicated person with muscular dystrophy may be more physically impaired overall than an intoxicated person without muscular dystrophy; however, it does not include the type of evidence that *Huck* requires, which would be that muscular dystrophy makes a person more susceptible to being adversely affected by alcohol in the first place. For that reason, the trial court erred in giving the *Miles* instruction in this case.

Again, as the uniform instruction states, a person is under the influence of an intoxicant when the person's physical or mental faculties are adversely affected by the intoxicant to a perceptible degree. *State v. Eumana-Moranchel*, 352 Or 1, 7-8, 277 P3d 549 (2012) ("[T]he state can prove that the person was 'under the influence of intoxicating liquor, a controlled substance, or an inhalant,' *that is, that the defendant was adversely affected by intoxicants to a perceptible degree*, ORS 813.010(1)(b), (c)." (Emphasis added.)). The susceptibility described in the *Miles* instruction relates to that question: whether someone in the defendant's condition will be adversely affected to a perceptible degree by a lesser amount of alcohol than a person who is not in that same condition.

Fahey's testimony, viewed in the light most favorable to the state, does not support an inference that alcohol has any greater intoxicating effect on someone with muscular dystrophy. In fact, Fahey repeatedly said the opposite. When asked whether someone with muscular dystrophy could "have a worsening of their general motor skills as compared to someone without muscular dystrophy with a lesser amount of alcohol," Fahey responded that "the impairment and the neurological part would be the same." Later, when asked to clarify, Fahey repeatedly made the point that "it's across the board, you would have that neurological effect" from alcohol, and that a person with muscular dystrophy

will be affected "just like it affects a person without muscular dystrophy."

Fahey's testimony also makes it clear that the "additive" effect he was describing had nothing to do with susceptibility to the neurological effects of alcohol. Rather, he was describing the combination of impaired motor skills from muscular dystrophy, which are specific to a person with muscular dystrophy, and the neurological effects that are caused by alcohol, which are not; together, they result in a greater overall level of impairment as a driver. He explained, "I think if you have the neurological coordination problem [caused by alcohol] with the already pre-existing muscular dystrophy problem, then you have an additive effect. That's what I'm trying to say." And, when directly asked whether there is "a difference between alcohol consumption and motor skill use with someone without muscular dystrophy in the same person with muscular dystrophy," he responded that it "adversely affects both, and if you're already having a hard time, that would make it [an] even harder time [with motor skills]."

But the question is not whether someone with muscular dystrophy under the influence will have more impaired motor skills than someone without that condition who is under the influence. The question for purposes of our DUII statute is whether the person is under the influence in the first place, which depends on the degree of impairment *from the intoxicant*, not the level of overall impairment that occurs once an already-impaired person is under the influence.

The state's argument fails to appreciate that difference. In defending the instruction, the state offers a syllogism: Alcohol would be more impairing to someone with defendant's physical condition than it would be to someone without that condition, and therefore, the person may be impaired by a lesser quantity of the alcohol. As a matter of logic, that does not follow. The degree of overall impairment from the combined effects of alcohol and muscular dystrophy do not give rise to any inference about the amount of alcohol that will cause a perceptible change in the faculties of a person with muscular dystrophy.

The state's argument only underscores the confusion that a *Miles* instruction can cause in a case like this, by inviting the wrong comparison. Rather than keeping the focus on the delta—a change in mental or physical faculties that is caused by the alcohol—the instruction can shift the focus to the overall level of impairment.

In fact, that is exactly what the prosecutor invited the jury to do. During his closing argument, the prosecutor directed the jury to Fahey's testimony and to the instruction about defendant's "physical condition." He explained that he wanted to "touch on this instruction, because we heard evidence by an expert in this case, a medical expert, Dr. Fahey." He then argued:

> "And I asked Dr. Fahey specifically: Is it wise for a person with muscular dystrophy to consume alcohol? Does that impair that person's motor function to a greater degree than someone who does not have muscular dystrophy? And if you will recall, I actually used an example of driving a vehicle. If somebody without muscular dystrophy is driving a vehicle and they are using their motor skills to drive that vehicle, is someone with muscular dystrophy going to be affected? Are their motor skills going to be affected to a greater degree than someone without muscular dystrophy?"

The prejudice from giving the instruction, in light of the way the case was litigated, is manifest, and the state does not contend otherwise. *See Massey*, 249 Or App at 693 ("[I]n the absence of evidence that a defendant's physical condition made him more susceptible to the effects of alcohol, 'the instruction [is] likely to mislead the jury to [the] defendant's prejudice and, therefore, it should not [be] given.'" (Quoting *Huck*, 100 Or App at 197; alterations in *Massey*.)). The instruction allowed the prosecutor to argue, without any evidence, that someone with muscular dystrophy will be impaired by fewer drinks and should not have consumed *any* alcohol because of the overall level of impairment that could result. Because both charges, DUII and reckless driving, were based on the theory that defendant drove while under the influence of intoxicants, and the instruction misled the jury on that issue, we reverse and remand both convictions. *See Massey*, 249 Or App at 693 (rejecting the state's

argument that the giving of the *Miles* instruction was harmless error).

Reversed and remanded.