Argued and submitted January 27, reversed and remanded June 29, petitions for review allowed November 3, 2022 (370 Or 455)
See later issue Oregon Reports

Jamie MARTINEAU,
Personal Representative of the
Decedent, Aaron Martineau,
*Plaintiff-Appellant,*

*v.*

McKENZIE-WILLAMETTE MEDICAL CENTER,
an assumed business name of
McKenzie-Willamette Regional Medical Center
Associates, a limited liability company,
*Defendant,*

*and*

RADIOLOGY ASSOCIATES, P.C.,
a corporation;
Dariusz Zawierucha, M.D., an individual;
Cascade Medical Associates,
the assumed business name of
Doctor's Emergency Room Corporation, P.C.,
a corporation;
and Gary Josephsen, M.D., an individual,
*Defendants-Respondents.*

Lane County Circuit Court
17CV36517; A172846

514 P3d 520

Plaintiff, in her capacity as personal representative of Aaron Martineau, brought medical malpractice claims against defendants. She appeals a general judgment entered after the trial court dismissed her claim for loss of chance of recovery and after a jury returned a verdict in favor of defendants on her wrongful death claim. *Held*: Uniform Civil Jury Instruction 44.03 is an incorrect statement of the law, and likely to mislead a jury; it was error to give it, and the error was not harmless on this record. The court also erred in dismissing plaintiff's claim for loss of chance of recovery, which was pleaded as an alternative to her wrongful death claim.

Reversed and remanded.

Charles D. Carlson, Judge.

Travis Eiva argued the cause and filed the briefs for appellant.

Lindsey H. Hughes argued the cause for respondents Gary Josephsen, M.D., and Cascade Medical Associates. Also on the brief were Hillary A. Taylor and Keating Jones Hughes, P.C.

Alice S. Newlin argued the cause for respondents Radiology Associates and Dariusz Zawierucha, M.D. Also on the brief were Jay W. Beattie, Nikola L. Jones, and Lindsay Hart, LLP.

Before James, Presiding Judge, and Egan, Judge, and Kamins, Judge.

JAMES, P. J.

Reversed and remanded.

**JAMES, P. J.**

Aaron Martineau visited the emergency room after experiencing chest pain and other symptoms. There, defendant Josephson examined him and arranged for a chest x-ray, which defendant Zawierucha read. Based on the results and on review of an electrocardiogram of a different patient, Josephson concluded that Martineau did not have an urgent cardiovascular problem or need further testing immediately. In fact, Martineau had an urgent cardiovascular problem, and he died approximately 24 hours later.

Plaintiff, in her capacity as personal representative of Martineau, brought medical malpractice claims against defendant Josephson and the Doctor's Emergency Room Corporation, P.C. (the ER defendants) and Zawierucha and Radiology Associates, P.C. (the radiology defendants). She appeals a general judgment entered after the trial court dismissed her claim for loss of chance of recovery and after a jury returned a verdict in defendants' favor on her wrongful death claim. Plaintiff raises five assignments of error. We write only to address two. As explained below, we conclude that the trial court erred in instructing the jury using Uniform Civil Jury Instruction (UCJI) 44.03, which is likely to mislead the jury and incorrectly states the law, and that the error was not harmless. Accordingly, plaintiff is entitled to a new trial on her wrongful death claim. We also conclude that the court erred in dismissing plaintiff's claim for loss of chance of recovery, which was pleaded as an alternative to her wrongful death claim. Our conclusion that a new trial is necessary obviates the need to address plaintiff's second through fourth assignments of error, as the evidentiary issues that they concern may not arise in the same way on remand. We reverse and remand.

## I.    UCJI 44.03

We begin by considering plaintiff's fifth assignment of error, in which she contends that the court erred in instructing the jury in the language of UCJI 44.03, which provides, "Physicians are not negligent merely because their efforts were unsuccessful. A physician does not guarantee a good result by undertaking to perform a service."

In objecting to the instruction, plaintiff pointed out that Oregon appellate courts have never approved giving it, and that, recently, in *Sherertz v. Brownstein Rask*, 288 Or App 719, 407 P3d 914 (2017), we cast doubt on its correctness in general and held that, in a legal malpractice case that turned on the attorney's promise to accomplish a particular result, it was reversible error for the court to give a modified version of it. In this case, the court rejected plaintiff's objection without explanation and gave the instruction.

We review a trial court's decision to give a particular instruction primarily to determine "whether the instruction, when read together with the other instructions given, completely and accurately stated the law applicable to the case." *Id.* at 722. In any jury trial, parties are entitled to have the jury instructed in the law that governs the case in plain, clear, simple language. Jury instructions should seek to assist and enlighten the jury, and to acquaint them in an approachable manner with the applicable law. " 'Everything which is reasonably capable of confusing or misleading the jury should be avoided. Instructions which mislead or confuse are ground for a reversal or a new trial.'" *Estate of Michelle Schwarz v. Philip Morris Inc.*, 348 Or 442, 454, 235 P3d 668, *adh'd to on recons*, 349 Or 521, 246 P3d 479 (2010) (quoting *Williams et al. v. Portland Gen. Elec.*, 195 Or 597, 610, 247 P2d 494 (1952)).

Medical malpractice cases are "nothing more than negligence actions against medical professionals. The fundamental issue in these cases, as in all negligence cases, is whether the defendant breached the standard of care and caused injury to the plaintiff." *Rogers v. Meridian Park Hospital*, 307 Or 612, 619-20, 772 P2d 929 (1989). Since 1975, a physician's duty of care has been codified in ORS 677.095, which now provides as follows:

"A physician licensed to practice medicine or podiatry by the Oregon Medical Board has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community."

To understand the instruction at issue here, it is necessary to place it in its historical context. As the Oregon

Supreme Court began to articulate the standard of care for physicians that was eventually codified in 1975, the court adopted two rules, commonly stated together, that it often applied in the course of evaluating the sufficiency of the evidence of negligence in medical malpractice cases. One of the rules was the "error-of-judgment rule," which distinguishes choices, or judgments, that later turn out to be incorrect, from medical negligence. *Rogers*, 307 Or at 615. *See, e.g.*, *Lehman v. Knott*, 100 Or 59, 71, 196 P 476 (1921) ("Improper treatment by a surgeon might be due to an error in judgment of a skillful surgeon honestly and carefully exercised, and not constitute negligent treatment."); *see also Hills v. Shaw*, 69 Or 460, 468, 137 P 229 (1913) ("The distinction between an error of judgment and negligence is not easily determined.").

In *Rogers*, the Supreme Court held that, in light of the statutory standard of care, it is error to instruct the jury in a medical malpractice case regarding a physician's judgment. 307 Or at 620. The court noted that the error-of-judgment rule derived both from the principle that a physician is not a warrantor of a cure and from the recognition that there may be more than one acceptable treatment for a given condition and that a choice between those treatments is not necessarily negligent. *Id.* at 615-16. Both of those concepts have been subsumed by the standard of care for physicians: "The fundamental issue in [medical malpractice] cases, as in all negligence cases, is whether the defendant breached the standard of care and caused injury to the plaintiff." *Id.* at 619.

The court concluded that the error-of-judgment instruction given in *Rogers* "obscures the fact that, to avoid liability, the defendant must exercise the degree of care, skill, and diligence required by law." *Id.* That is, by directing the jury's attention to whether there are reasonable differences of opinion in the medical community and whether a physician exercised reasonable judgment, the instruction directed attention *away* from what is actually the critical issue in a medical malpractice case—whether the physician exercised reasonable care. *Id.* For that reason, and because the phrase "error of judgment" was also confusing, the court

held that it was error to instruct the jury in terms of a physician's judgment: "[S]uch instructions not only confuse, but they are also incorrect because they suggest that substandard conduct is permissible if it is garbed as an 'exercise of judgment.'" *Id.* at 620.

The second rule that the Supreme Court adopted in early cases—and that, as the court noted in *Rogers*, formed one of the grounds on which the error-of-judgment rule was based: "[A] physician is not a warrantor of a cure." *Crewse v. Munroe*, 224 Or 174, 177, 355 P2d 637 (1960); *see also, e.g.*, *Hotelling v. Walther*, 169 Or 559, 562, 130 P2d 944 (1942) ("Dentists, like physicians and surgeons, are not guarantors of good results.").

The idea that a physician is not a warrantor of a cure is intertwined in Oregon appellate case law with a concept that the court did not discuss in *Rogers*—namely, *res ipsa loquitur*, a doctrine of negligence in which an accident or injury "speaks for itself." *Watzig v. Tobin*, 292 Or 645, 648, 642 P2d 651 (1982). "In essence, [*res ipsa loquitur*] is a rule of circumstantial evidence that allows an inference of negligence to be drawn if the accident is of a kind which ordinarily would not have occurred in the absence of the defendant's negligence, even though it is impossible to determine the specific way in which the defendant was negligent." *Id.* Before presenting any argument of that kind to the jury, the party invoking the doctrine must present evidence sufficient to "establish that the harm more probably than not would not have occurred in the absence of negligence on the part of the defendant. That determination cannot be based on speculation and conjecture and cannot be drawn from probabilities evenly balanced." *Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 146, 309 P3d 1073 (2013) (internal citation and quotation marks omitted).

In early medical malpractice cases, plaintiffs sometimes implicitly or explicitly sought to apply the doctrine of *res ipsa loquitur* to support an argument that, because a physician's treatments did not succeed, the physician must have been negligent. For example, in *Hills*, a plaintiff contended that the defendant physician had been negligent in setting a broken leg in a way that caused the broken bones

not to join while they healed. 69 Or at 461-62. The court observed, "To all appearances, so far as the testimony discloses, the leg was treated by the usual methods known and approved by reputable surgeons." *Id.* at 464. After quoting two cases discussing the applicability of *res ipsa loquitur* to medical malpractice claims and citing other cases, the court explained:

> "The substance of the doctrine taught by these cases is that if a regularly licensed physician with reasonable diligence employs the skill of which he is possessed in treating a surgical case, he is not liable for an error of judgment, *and that the mere fact that an untoward result ensues is not in any sense evidence of negligence.* There are so many elements combating the surgeon in his efforts to restore a patient to bodily soundness that he can do no more than exercise his best skill and judgment to accomplish the desired result."

*Id.* at 467-68 (emphasis added). Applying that rule to the facts, the court explained that the plaintiff's evidence was insufficient to prove negligence:

> "No lack of application of the ordinary remedies is shown. Reduced to its lowest terms, the case is one where the surgeon has treated a case in which the result was a failure. There is nothing to show that he did not do his best with what skill he possessed. *The error of plaintiff's contention consists in relying upon the abortive result of the treatment as an evidence of negligence on the part of the defendant, without showing further that some careless act or omission of his produced that undesirable consequence.* To hold defendant liable under such circumstances would be to make him an absolute insurer of success in every operation which he undertook."

*Id.* at 469 (emphasis added); *see also Emerson v. Lumbermen's Hospital Assn.*, 100 Or 472, 480, 481, 198 P 231 (1921) (the death of the plaintiffs' decedent after his leg was crushed by a railroad car and he was treated by the defendant doctor was "no evidence of want of care, or of unskillfulness or failure to administer proper treatment"; nonsuit was proper where there was "an entire lack of testimony as to whether or not [the defendant doctor] adopted and applied the proper method of treating" the decedent). In those cases, among others, the Supreme Court relied on the principle that a

physician does not guarantee a cure to reject the plaintiffs' express or implicit *res ipsa loquitur* arguments.

That principle—that, because a physician does not guarantee a cure, an inference of negligence does not arise under the concept of *res ipsa loquitur* simply from a poor outcome in a medical malpractice case—is now well established in the Supreme Court's and our own case law. *See, e.g.*, *Ritter v. Sivils*, 206 Or 410, 413-14, 293 P2d 211 (1956) (finding it unnecessary to cite authority for the proposition that "[a] chiropractor is not a warrantor of cure, and if a good result does not ensue from his efforts the doctrine of *res ipsa loquitur* is not available to his erstwhile patient," among others, because the propositions "have been many times enunciated by this court"); *Trees v. Ordonez*, 250 Or App 229, 241, 279 P3d 337 (2012), *rev'd on other grounds*, 354 Or 197, 311 P3d 848 (2013) (noting Oregon courts' reluctance to apply *res ipsa loquitur* in medical malpractice cases "based on the concern that the doctrine will impinge on the established principle that a physician is not a warrantor of a cure, and if a good result does not ensue from his efforts the doctrine of *res ipsa loquitur* is not available to his erstwhile patient" (internal quotation marks and ellipsis omitted)).

Thus, the principle that a physician is not a warrantor of a cure is potentially significant in two ways in a medical malpractice action. First, as the Supreme Court suggested in *Rogers*, it, and the error-of-judgment rule that rests, in part, on it, are early attempts at articulating the standard of care for physicians, albeit ones that approach the problem somewhat differently than the formulation that the Supreme Court, and the legislature, ultimately settled on. Second, the principle that a physician is not a guarantor of a cure is also a specific application of what courts now recognize as the general requirement that a party invoking the doctrine of *res ipsa loquitur* "must establish that the harm more probably than not would not have occurred in the absence of negligence on the part of the defendant."[1] *Hagler*, 354 Or at 146 (internal quotation marks omitted).

---

[1] In a medical malpractice case, as other contexts, when the plaintiff *does* make a showing that the harm more probably than not would not have occurred in the absence of the defendant's negligence, *res ipsa loquitur* applies. *Mayor v. Dowsett*, 240 Or 196, 220, 400 P2d 234 (1965) (holding that *res ipsa loquitur*

With that historical context in mind, we now turn to the jury instruction at issue. Again, the instruction provides, "Physicians are not negligent merely because their efforts were unsuccessful. A physician does not guarantee a good result by undertaking to perform a service." UCJI 44.03.

We begin by noting that Oregon courts have repeatedly admonished that not every principle of law stated in an appellate decision makes a good jury instruction:

> "An instruction that accurately quotes or faithfully paraphrases an appellate decision is not necessarily beyond reproach. Indeed, 'it is not advisable in charging the jury to use the exact words of an appellate court opinion \*\*\*.' *Ireland v. Mitchell*, 226 Or 286, 294, 359 P2d 894 (1961). In *Amfac Foods v. Int'l Systems*, 294 Or 94, 99 n 3, 654 P2d 1092 (1982), we warned that because many appellate opinions are written with no view that they will be turned into instructions, care must be exercised in using the language of these opinions for instructions to juries. *See also Thornburg v. Port of Portland*, 244 Or 69, 73, 415 P2d 750 (1966)."

*Rogers*, 307 Or at 616. *See also, e.g.*, *State v. Avila*, 318 Or App 284, 290-91, 507 P3d 704 (2022) (noting that "the *Miles* instruction has been a case study in the risks attendant to drawing jury instructions from short snippets of opinions"); *Sherertz*, 288 Or App at 725 n 2 ("Jury instructions drawn from short snippets of opinions pose challenges."). UCJI 44.03 provides good example of the hazards of that practice.

---

applied in a medical malpractice case where the plaintiff had presented expert testimony that "the injury suffered by the plaintiff is one that does not ordinarily occur in the absence of negligence"); *Fieux v. Cardiovascular & Thoracic Clinic, P.C.*, 159 Or App 637, 642, 978 P2d 429, *rev den*, 329 Or 318 (1999) (the plaintiff met his burden to rely on *res ipsa loquitur*, even absent expert testimony regarding the standard of care, because "it is within the capability of a jury to ascertain that a clamp is not normally left inside a patient unless someone was negligent").

In other words, although, as the jury instruction at issue in this case phrases it, a physician does not generally "guarantee a good result," in the sense of an ultimate cure for the patient, "by undertaking to perform a service," (at least in the absence of a contract, *Emerson*, 100 Or at 481), a physician does guarantee some kinds of "results": The physician implicitly guarantees not to cause injuries through medical negligence—for example, injury caused by leaving a clamp inside a patient after surgery. *Fieux*, 159 Or App at 644-45.

Although, as we have explained, the principle that a physician is not a warrantor of a cure has often been stated in appellate cases, the instruction nevertheless is not useful in the jury's assessment of a physician's negligence because it both obscures the correct legal inquiry and is incorrect as a categorical statement of the law. First, to the extent that the principle that a physician does not guarantee a good result is an articulation of the standard of care, it suffers from the same problem that the error-of-judgment instruction rejected in *Rogers* did: Its inclusion in the instructions "obscures the fact that, to avoid liability, the defendant must exercise the degree of care, skill, and diligence required by law." 307 Or at 619. By directing the jury's attention to the success or lack thereof of a physician's efforts and what "result" a physician promises by undertaking to provide medical services, it directs attention away from what the legislature has established as the critical question: whether the physician used "that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community." ORS 677.095.

The latter sentence of the instruction—"[a] physician does not guarantee a good result by undertaking to perform a service"—is incorrect when stated as a categorical proposition. Critically, the instruction uses the word "result" not "cure." Although a physician usually does not guarantee a *cure* by undertaking to perform medical services—that is, medical treatment is inherently uncertain in many ways, and the likelihood that a medical problem will be conclusively resolved through any particular course of treatment varies depending on a vast array of circumstances—there are situations in which a physician guarantees some particular good *result*—a "consequence or effect"—by undertaking to perform medical services. *Webster's Third New Int'l Dictionary* 555 (unabridged ed 2002) (defining "cure" as "recovery from a disease"); *id.* at 1937 (defining "result" as anything "that results as a consequence, effect, issue, or conclusion"). A physician does guarantee avoidance of injuries of a kind that do not occur in the absence of medical negligence—for example, an injury caused by leaving a clamp inside a patient after surgery. *Fieux*, 159 Or App at

644-45. Further, there are factual scenarios outside of *res ipsa loquitur* in which a physician guarantees some particular result, in the sense of a consequence or effect—even if that result is not a cure. *See, e.g.*, *Emerson*, 100 Or at 481 (noting that the principle that a physician does not guarantee a cure applies only "in the absence of a contract to that effect"); *Sherertz*, 288 Or App at 725 (Previous cases "do not support the proposition that a physician, as a matter of law, can never guarantee *some* result. For example, if a patient sees a physician to have her appendix removed, one expected 'result' is the removal of an appendix, not an amputation of a foot." (Emphasis added.)).[2]

Thus, there are two problems with the instruction: it obscures the fact that the correct focus is on application of the standard of care, and, because the meaning of "result" is broader than the meaning of "cure," its statement that "[a] physician does not guarantee a good result by undertaking to perform a service" is incorrect when stated—as it is in the instruction—as a universal principle. To the extent that the instruction could add any clarity to the jury's understanding of the law, any potential benefit is fatally outweighed by its potential to confuse the jury and its incorrectness as a statement of the law.[3] In short, UCJI 44.03 is an incorrect statement of the law, and likely to mislead the jury. It was error for the court to give it.

Having determined that giving the instruction was error, we must next consider whether the error was harmless. In the context of instructional error, whether an error is harmless turns on whether "the error had a detrimental influence on a party's rights." *Purdy v. Deere & Co.*, 355

---

[2] As defendants pointed out at oral argument, the physician likely does not *guarantee* that the appendix will be removed—it may be that, after surgery begins, some unexpected development makes that inadvisable. In that situation, the guaranteed result, or consequence, is that the patient's foot will not be amputated. In a case involving that fact scenario, it would clearly be wrong to instruct the jury that, by undertaking to treat the patient for appendicitis, the physician made no implicit promise that the patient's foot would remain intact.

[3] We also note that, in this case, the court also instructed the jury that "the mere fact alone that a patient experienced an adverse outcome is not sufficient to prove negligence." That instruction provided the jury with clarification—to the extent that any was necessary or desirable, a question on which we express no opinion—that the outcome of treatment, alone, did not allow any particular conclusion about whether defendants' conduct met the standard of care.

Or 204, 226, 324 P3d 455 (2014) (internal quotation marks omitted); *see also* ORS 19.415(2) ("No judgment shall be reversed or modified except for error substantially affecting the rights of a party."). We must assess "the extent to which an error skewed the odds against a legally correct result." *Purdy*, 355 Or at 226. "[L]ittle likelihood is not enough, but more—that is, 'some' or a 'significant' likelihood that the error influenced the result—will suffice for reversal." *Id.*

As we set forth at the beginning, the evidence showed that Martineau's trip to the emergency room was prompted by chest pain and other symptoms. The ER defendants examined him and took a chest x-ray, which the radiology defendants read, and, based on the results and on review of an electrocardiogram of a different patient, defendants concluded that the decedent did not have an urgent cardiovascular problem or need further testing immediately. Martineau died within 24 hours of that conclusion.

Plaintiff's theory of the case was that defendants negligently failed to recognize the urgency of the decedent's condition when he came to the emergency room. She argued that the decedent "did his part" when he went to the emergency room and informed the ER defendants of his symptoms; after the decedent did that, she contended, it was up to the defendants to correctly determine that he needed a CT scan to rule out the possibility that he was suffering from an urgent cardiovascular problem. If defendants had done that, plaintiff argued, the CT scan would have identified the problem and emergency surgery could have saved his life.

Plaintiff contended that the risk from giving the instruction in this case was that, in light of the instruction that no "good result" was promised, the jury might reason that defendants' duty of care did not require defendants to order a CT scan because the CT scan—which was the main focus of plaintiff's theory of the case and argument to the jury—was the "good result" referred to in the instruction.

We conclude that the error was not harmless. As described above, the instruction is misleading because it suggests that the results of a physician's efforts are relevant to the determination of negligence in some way that

is independent of the standard of care. It could have caused the jury to reason that conduct that failed to meet the standard of care nonetheless was not negligent because a physician does not promise a good result. *See Rogers*, 307 Or at 620 (error-of-judgment instructions are "incorrect because they suggest that substandard conduct is permissible if it is garbed as an 'exercise of judgment'"). The jury could have applied that principle to, for example, the radiology defendants' reading of the x-ray or the fact that the ER defendants evaluated the electrocardiogram of a different patient, concluding that those acts were not done with the degree of care, skill, and diligence required by law but that they nevertheless were not negligent because no good result was promised.

That risk of misleading the jury was particularly pronounced here, where plaintiff's theory of the case turned on defendants' failure to reach a particular result that, in plaintiff's view, was compelled under the circumstances by the standard of care. Plaintiff's case exemplifies the difference between guaranteeing a *cure* and guaranteeing a *result*. Sometimes, the minimum professional standard of care does, in fact, dictate a result—a follow up, a test, an action. Here, plaintiff argued that, given their roles as emergency room personnel, and in light of the decedent's cardiovascular symptoms, defendants were obliged to examine and test plaintiff sufficiently to discover whether he had a condition that needed care urgently. That, plaintiff contended, is what emergency rooms are for. In plaintiff's view, having undertaken to perform the service of determining whether plaintiff had an urgent cardiovascular condition, defendants were obliged to conduct a thorough examination in accord with the standard of care, including testing and performance of a CT scan, which, accordingly to plaintiff, would have saved the decedent's life.

Given that theory of the case, the instruction that "[a] physician does not guarantee a good result by undertaking to perform a service" may well have led the jury to conclude that, even if a CT scan was required under the standard of care, defendants did not need to order it because they had not guaranteed that they would reach that "good result." As litigated, we cannot conclude that there is not

"some" likelihood that the erroneous instruction influenced the jury's conceptualization of the standard of care, and accordingly, the result. *Purdy*, 355 Or at 226. Therefore, the instructional error was not harmless.

## II.  LOSS OF CHANCE CLAIM

Next, we consider plaintiff's first assignment of error, in which she argues that the court erred in dismissing, pursuant to ORCP 21 A(1)(h), her claim for loss of chance of survival of the decedent, which she alleged as an alternative to her wrongful death claim:

> "Based on the aforementioned conduct, defendants hospital, ER corporation, ER physician, radiology corporation, and radiologist caused [decedent] to suffer a loss of a chance at a better medical outcome that he would have been able to pursue as a negligence claim had he survived. Those economic and noneconomic damages will be determined by the jury, in accordance with the law, and are not to exceed $5,000,000.00."

The radiology defendants, but not the ER defendants, moved to dismiss that claim for failure to state a claim or, alternatively, for an order requiring plaintiff to make the allegations more definite and certain. In support of the motions, they made two arguments: First, they argued that, as a matter of law, a plaintiff "is not permitted to plead both wrongful death and survivorship claims arising from the same negligence and injuries," relying on the text of ORS 30.075 and Supreme Court case law. Second, they argued that plaintiff had not "adequately pleaded a loss of chance claim because Plaintiff has not alleged the percentage chance lost to a reasonable medical probability, and has not identified a significant or substantial opportunity for treatment missed as a result of Defendants' care."

In her response, plaintiff disagreed that the relevant case law required more specific pleading of the loss of chance. Alternatively, she proposed the following, with the proposed addition in boldface, to make the allegations more definite:

> "Based on the aforementioned conduct, defendants hospital, ER corporation, ER physician, radiology corporation, and radiologist caused [decedent] to suffer a loss of a

[**greater than 30%**] chance at a better medical outcome that he would have been able to pursue as a negligence claim had he survived."

The trial court did not signal how it was leaning, but plaintiff noted, at the end of the argument, "I just wanted to let you know in our briefing we just—we offer the Court an alternative more definite pleading, I just want to make sure the Court was aware of that." The trial court responded, "I saw that," and then said that it would issue a ruling later that day. The court did so, issuing an order that stated simply, "Motion No. 2—Motion to dismiss Claim Three is GRANTED," followed by, "Plaintiff has 20 days to replead." Plaintiff then filed an amended complaint, which omitted the loss-of-chance claim entirely.

## A.  *Procedural Arguments*

As a predicate matter, each group of defendants raises procedural reasons that we should not address the merits of the first assignment of error. The radiology defendants contend that, if we reject plaintiff's other assignments of error, regarding the legitimacy of the jury's verdict, any error was harmless as to them, because the jury found that they were not negligent and, accordingly, would not have found in plaintiff's favor on a loss-of-chance claim if it had been tried. The ER defendants contend that, because only the radiology defendants, not the ER defendants, moved against the loss-of-chance claim, the court's grant of the motion to dismiss affected that claim only as to the radiology defendants, not as to the ER defendants. As a result, in their view, when plaintiff filed an amended complaint omitting the loss-of-chance claim altogether, she abandoned her loss-of-chance claim against the ER defendants. The ER defendants also appear to contend that plaintiff abandoned or withdrew her loss-of-chance claim against all defendants when she failed to replead it with more specificity after the trial court dismissed it.

Taking each of those arguments in turn, we first conclude that the radiology defendants' harmlessness argument fails, as they seem to acknowledge it must, because we have concluded that the trial court erred in instructing the jury. As a result, on remand, the case will be back in a

pretrial posture, so any error committed pretrial must be remedied, regardless whether the error would be harmless in a different procedural posture.

The ER defendants' contentions that plaintiff abandoned or withdrew her loss-of-chance claim are not supported by the record. As we view the record—a view with which the radiology defendants appear to agree—the trial court granted the radiology defendants' ORCP 21 A(1)(h) motion, rather than their alternative motion for an order to make more definite and certain. If the court had done the latter, it would have ordered plaintiff to make the pleading more definite and certain, and it did not do that. Rather, it dismissed the claim, which was the appropriate course of action if it was granting the motion to dismiss.

Based on the arguments that had been presented to the court before it dismissed the claim, plaintiff could assume—as we do on appeal—that the court had dismissed the loss-of-chance claim because it agreed with the radiology defendants that, as a matter of law, plaintiff was not permitted to plead a survivorship claim based on loss of chance of recovery where, as described further below, death was an element of the claim. That reasoning was categorical, not dependent on the identity or circumstances of any particular defendant. Given that situation, it would have been unreasonable for plaintiff's new pleading to include a claim for loss of chance against the ER defendants. At best, given the court's ruling, to include that claim would have been futile; at worst, the court might have penalized plaintiff for wasting its and defendants' time.

In omitting the loss-of-chance claim from her amended complaint, plaintiff did not abandon or withdraw that claim; rather, she recognized and gave effect to the court's ruling on the claim. On remand, plaintiff may move to amend the complaint to reallege the loss-of-chance claim against the ER defendants, who, under these circumstances, will not be prejudiced by the amendment.[4] *See Eklof v. Persson*, 369 Or 531, 533, 508 P3d 468 (2022)

---

[4] As noted further below, 320 Or App at 562, we leave questions about what is required to plead this type of claim to the parties and the court on remand.

("[T]he gravamen of the inquiry [on a motion to amend the pleadings] under ORCP 23 A is prejudice to the opposing party[.]").

B.    *Loss of Chance of Recovery*

   1.    *Legal context*

   Turning now to the merits of plaintiff's first assignment of error, the parties' arguments turn on the operation of ORS 30.020, ORS 30.075, and the Supreme Court's case law delineating the contours of common-law negligence claims. We touch on each briefly before applying them to the case before us.

   ORS 30.020 establishes a statutory cause of action for wrongful death. As relevant here, ORS 30.020(1) provides:

   "When the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent *** may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission."

   In general, and in Oregon, the existence of statutory wrongful death actions has prevented development of a common law of wrongful death claims. *See Hughes v. PeaceHealth*, 344 Or 142, 151, 178 P3d 225 (2008) (explaining that, with the enactment of statutory wrongful-death actions, "efforts to develop a common law of wrongful death came to a halt"; "[q]uite simply, courts were reluctant to recognize a common-law remedy that might compete with their states' newly adopted wrongful death statutes").

   In *Joshi v. Providence Health System*, 342 Or 152, 157, 149 P3d 1164 (2006), the Supreme Court interpreted the phrase "when the death of a person is caused by the wrongful act or omission of another," ORS 30.020(1), and held that, in cases that do not fall within narrow exceptions, the word "caused" refers to a "but-for" test of causation: A plaintiff must show that, but for the negligence of the defendant, the decedent would not have died. *Joshi*, 342 Or at 162.

   The court also declined to adopt a theory of loss of chance of survival as an alternative theory of recovery—one

that would include a "substantial factor" or "substantial possibility" test, rather than a "but-for" test, for causation—in an action under the wrongful death statute. *Id.* at 163-64. The court explained that the loss-of-chance theory was inconsistent with the text of ORS 30.020(1):

> "That statute requires that a plaintiff prove that a defendant's negligent act or omission *caused* the decedent's *death*. \*\*\* [T]he plaintiff must demonstrate that defendant's negligent acts or omission was sufficient to bring about decedent's death. Plaintiff cannot avoid this requirement by showing that defendant's negligent act or omission merely increased the risk of death."

*Id.* at 163-64 (emphases in original).

The court explained that, in the case before it, the plaintiff's expert had testified that the defendants' negligence had deprived the decedent of a 30 percent chance of survival, and, thus, that that testimony did not meet the plaintiff's burden to show but-for causation. *Id.* at 164. The court held, "Although deprivation of a 30 percent chance of survival may constitute an injury, the injury that is compensable under ORS 30.020 is death. Therefore, plaintiff has failed to prove the elements of the wrongful death action as set forth in the statute." *Id.*

Unlike wrongful death claims, negligence claims based on injuries other than death are governed by common law. *Smith v. Providence Health & Services*, 361 Or 456, 463, 393 P3d 1106 (2017). In *Smith*, the Supreme Court held that loss of chance of recovery is a cognizable injury in a common-law negligence claim: "Oregon law permits a plaintiff who has suffered an adverse medical outcome resulting in physical harm to state a common-law medical negligence claim by alleging that the defendant negligently caused a loss of his or her chance at recovery." *Id.* at 458.

The plaintiff in *Smith* had sought medical care from the defendants while experiencing symptoms of a stroke, and the defendants had not promptly ordered testing that would have identified the stroke. The plaintiff suffered significant permanent impairment from the stroke. The plaintiff alleged that, as a result of the defendants' negligence, he had lost an opportunity for treatment that had

a 33 percent chance of resulting in greatly reduced or no permanent symptoms from the stroke. *Id.* at 460. The trial court dismissed the claim, concluding that loss of chance of a better outcome was not a viable theory of negligence, and we affirmed. *Id.* at 458.

The Supreme Court disagreed. It held that the loss of chance of recovery, itself, was the injury, and that Oregon common law should recognize a claim for medical negligence that causes that injury. *Id.* First, the court concluded that the question before it was one of first impression. *Id.* at 463. Among other things, it distinguished its holding in *Joshi*, explaining that, in *Joshi*, it had been tasked with construing the wrongful death statute rather than applying the common law of negligence:

> "As we noted [in *Joshi*], '*although deprivation of a 30 percent chance of survival may constitute an injury*, the injury that is compensable under ORS 30.020 is death.' In contrast, this case is not bound by a statute that requires that plaintiff prove that defendants caused a specific injury. Rather, the issue presented concerns a claim for medical negligence under Oregon's common law."

*Smith*, 361 Or at 464 (internal citation and brackets omitted; emphasis in *Smith*).

Then the court considered whether to recognize loss of chance of recovery as an injury in common-law medical negligence. It explained that "failing to recognize a loss-of-chance theory of injury in the context of medical malpractice has the effect of insulating from malpractice claims the negligent services that medical providers have given to those who seek treatment for conditions when their odds of a favorable medical outcome are less than 51 percent before treatment but who can prove that they had an opportunity to realize that favorable outcome with appropriate treatment." *Id.* at 479-80. The court pointed out that to prevent tort recovery under those circumstances offended two basic principles of the tort system: It prevented the tort system's function of "distribut[ing] the risk of injury to or among responsible parties" and it undercut the "'prophylactic' factor of preventing future harm." *Id.* at 480. Considering a hypothetical scenario of patients with a 45 percent chance of a favorable

outcome that was wiped out by a physician's negligence, the court explained that the "all-or-nothing rule" of a standard medical malpractice case "always results in negligent physicians avoiding liability and in uncompensated patients— even though in 45 out of 100 instances, the patients suffered their adverse medical outcomes because of the physician's negligence." *Id.* Further, the court noted, the special relationship between physicians and their patients counsels in favor of allowing recovery for loss-of-chance injuries because "the physician's breach of the duty to the patient results in a situation in which no one can know whether the patient would have recovered with proper medical care." *Id.*

The court also rejected the defendants' contention that the legislature, rather than the court, was the appropriate body to recognize loss of chance as an injury in medical malpractice cases. The court explained that, "regardless of whether the legislature could have in the past or may in the future weigh in on this issue, this court is the forum for a case involving a common-law medical malpractice claim[, and] we are called on to decide common-law cases properly presented to us." *Id.* at 482.

Because the loss-of-chance claim in *Smith* had been dismissed at the pleading stage, the case presented "only a limited opportunity to discuss the various aspects of such a claim and the considerations in litigating a medical malpractice claim in which the plaintiff alleges the loss of a chance at a recovery or better medical outcome." *Id.* However, the court nevertheless addressed some "practical concerns" that had been raised by the defendants and *amici*, to provide guidance on remand. *Id.*

First, the court noted that it did not need to decide precisely what kind or degree of chance was necessary, because the plaintiff's allegation that he had lost "a 33 percent chance of total or close to total recovery from his stroke had defendants provided him with non-negligent care" was sufficient, as a matter of law. *Id.* at 483. Second, it explained that "fairness to defendants requires that plaintiff plead with specificity the lost chance of a better medical outcome." *Id.* "In practical terms, a plaintiff must plead the percentage and quality of his or her loss of chance, which in turn

must be based on the plaintiff's experts and relevant scientific evidence that meets the standard of reasonable medical probability." *Id.*

In a footnote, the court distinguished a "loss of chance as injury" claim from a "standard medical malpractice claim." *Id.* at 483 n 5. It explained that the case before it was a loss-of-chance claim "because plaintiff was unable to allege that he had at least a 51 percent chance of recovery but for defendants' malpractice"; thus, the injury was the loss of chance itself. *Id.* By contrast, it noted, a standard medical malpractice claim "involves proof of the medical outcome as the injury and not the lost chance as the injury." *Id.*

Third, the court explained that, although the injury is a loss of chance of recovery, an "adverse medical outcome resulting in physical harm," *id.* at 458, is still an element of the claim:

> "[A]s his complaint reflects, plaintiff has suffered the physical harm that he might well have avoided had he received proper medical care. That present adverse medical outcome is an essential element of a common-law medical malpractice claim and provides the foundation for a calculation of plaintiff's damages."

*Id.* at 483.

Thus, *Smith* establishes that (1) "loss of chance of recovery" is a cognizable injury in a common-law medical negligence claim in Oregon, *id.* at 458; (2) to bring such a claim, "a plaintiff must plead the percentage and quality of his or her loss of chance," *id.* at 483; and (3) "[a] present adverse medical outcome is an essential element of a common-law medical malpractice claim," and, in a claim for loss of chance of recovery (unlike in a standard medical malpractice claim, in which the adverse medical outcome is the injury, *id.* at 483 n 5) the present adverse medical outcome "provides the foundation for a calculation of plaintiff's damages," *id.* at 483; *see also id.* at 460 ("In a professional negligence claim, a plaintiff must allege and prove the following: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff

measurable in damages; and (4) causation, *i.e.*, a causal link between the breach of duty and the harm." (Internal quotation marks omitted.)).

One more point of law is relevant to our analysis of this case: After a person's death, the continuation of a personal injury action that sounds in negligence is governed by ORS 30.075, the survivorship statute. That statute provides, as follows:

"(1)   Causes of action arising out of injuries to a person, caused by the wrongful act or omission of another, shall not abate upon the death of the injured person, and the personal representatives of the decedent may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission. * * *

"(2)   In any such action the court may award to the prevailing party, at trial and on appeal, a reasonable amount to be fixed by the court as attorney fees.

"(3)   Subsection (2) of this section does not apply to an action for damages arising out of injuries that result in death. If an action for wrongful death under ORS 30.020 is brought, recovery of damages for disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting death of the decedent may only be recovered in the wrongful death action, and the provisions of subsection (2) of this section are not applicable to the recovery."

2.   *Parties' arguments*

With that legal context in mind, we consider the parties' arguments about what they agree was the trial court's dismissal of the claim on the ground that plaintiff could not plead a common-law claim based on loss of chance of recovery as an alternative to her wrongful death claim. Plaintiff contends that the claim that the trial court dismissed was for common-law negligence, and that the injury that she alleged was the decedent's loss of chance of recovery. In her view, that claim was not affected by the wrongful death statute, because the injury for which she sought compensation in the claim at issue was not death; it was

a loss of chance of recovery. *See Smith*, 361 Or at 464 ("As we noted [in *Joshi*], '*although deprivation of a 30 percent chance of survival may constitute an injury*, the injury that is compensable under ORS 30.020 is death.' In contrast, this case is not bound by a statute that requires that plaintiff prove that defendants caused a specific injury. Rather, the issue presented concerns a claim for medical negligence under Oregon's common law." (Quoting *Joshi*, 342 Or at 164 (emphasis in *Smith*; internal citation omitted).)).

Further, in plaintiff's view, the claim did not abate upon the decedent's death, because it is an action that "the decedent might have maintained * * *, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." ORS 30.075(1). In other words, she contends that, as demonstrated by the court's holding in *Smith*, a person who lives can bring a common-law negligence claim where the injury is loss of chance of recovery, so, if the decedent had lived, he would have been able to maintain that kind of action—an action "against the wrongdoer for an injury done by the same act or omission." ORS 30.075(1).

Finally, plaintiff contends that none of the law set out above can reasonably be understood to prevent a plaintiff from alleging, as alternatives, a wrongful death claim—in which the plaintiff must prove that the defendants' negligence was the but-for cause of the decedent's death—and a claim for loss of chance of recovery based on the decedent's death—in which the plaintiff must prove that, even though the defendants' negligence was not the but-for cause of the decedent's death, the defendants' negligence was the but-for cause of the loss of a less-than-51-percent chance of survival of the decedent. *See* ORCP 16 D ("Inconsistent claims or defenses are not objectionable and, when a party is in doubt as to which of two or more statements of fact is true, the party may allege them in the alternative. A party may also state as many separate claims or defenses as the party has, regardless of consistency * * *."); *Dotson v. Smith*, 307 Or 132, 136, 764 P2d 540 (1988) ("ORCP 16 [D] allows inconsistent claims."). Thus, plaintiff contends that there was no substantive reason for the trial court to dismiss her claim.

Defendants advance a variety of reasons that, under their view of the law that we have set out above, a plaintiff cannot allege both a wrongful death claim and a claim for loss of chance of recovery based on the same facts and circumstances. The radiology defendants contend that any claim based on loss of chance of *survival*—that is, a loss of chance of recovery where the adverse medical outcome was death—did not survive the decedent's death under ORS 30.075(1) because the claim is not one that "the decedent might have maintained *** , had the decedent lived, against the wrongdoer for an injury done by the same act or omission." They further contend that, to the extent that plaintiff's claim here is based on a loss of chance of recovery that does not involve death, plaintiff could not recover damages for the loss-of-chance claim, because "ORS 30.075(3) makes clear that damages for pre-death personal injury including 'disability, pain, suffering and loss of income' may only be recovered in an action for wrongful death if such an action is brought."

The ER defendants contend that any claim in which death is an element must be brought under the wrongful death statute. Consequently, in their view, plaintiff's claim here is decisively distinguishable from the claim at issue in *Smith* because plaintiff's claim alleged the death of the decedent as an element, even though it was not the alleged injury.

3.  *Analysis*

We consider each of those contentions in turn and, as explained below, conclude that none of them is correct. Thus, we agree with plaintiff that the trial court erred in concluding that, as a matter of law, she could not bring her claim for loss of chance of recovery as an alternative to her wrongful death claim.

The radiology defendants first argue that a claim for loss of chance of recovery where death is the "present adverse medical outcome" (which, as the court explained in *Smith*, is an element of the claim and is necessary to calculate damages) is not an action that "the decedent might have maintained *** , had the decedent lived, against the

wrongdoer for an injury done by the same act or omission." ORS 30.075(1). That is so, they contend, because, if the decedent had lived, he would not have suffered death, so he could not have brought a claim for loss of chance of recovery in which the present adverse medical outcome was death.

We review questions of statutory interpretation for legal error, seeking to discern the intention of the legislature by considering the text and context of a statute and, to the extent that it is helpful, its legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

The radiology defendants' view of ORS 30.075(1) is flawed. The text and context demonstrate that the legislature did not intend ORS 30.075(1) to require the claim brought by a personal representative after the injured person's death to be identical in every element to the claim that "the decedent might have maintained * * *, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." The text allows the personal representative to maintain "an action against the wrongdoer" any time "the decedent might have maintained an action, had the decedent lived, against the wrongdoer *for an injury done by the same act or omission*." ORS 30.075(1) (emphasis added). It does not say that the elements of the claim, the injury, or the specific theory of culpability that would give rise to the claim brought by the personal representative must be the same as the ones that the decedent might have alleged; only the act or omission of the wrongdoer must be the same.

Further, context evidences that the legislature did not intend the text to limit the action brought by the personal representative to claims with exactly the same elements as those that the decedent could have brought. The legislature used the same phrasing that appears in ORS 30.075(1) to describe the circumstances under which the personal representative of the decedent or some other person may bring a wrongful death claim: ORS 30.020(1) provides that, "[w]hen the death of a person is caused by the wrongful act or omission of another," specified people "may maintain an action against the wrongdoer, *if the decedent might have maintained an action, had the decedent lived,*

*against the wrongdoer for an injury done by the same act or omission*." (Emphasis added.)

If we were to interpret the text of ORS 30.075(1) to prohibit the personal representative from bringing a claim whose elements included death—because, as defendants argue, if the decedent had lived, he would not have suffered death, so he could not have brought a claim whose elements include death—then the same logic would apply to the wrongful death statute. *See, e.g., State v. Cloutier*, 351 Or 68, 99, 261 P3d 1234 (2011) ("[I]n the absence of evidence to the contrary, we ordinarily assume that the legislature uses terms in related statutes consistently."). The result would be that no one could ever bring a wrongful death claim, because its elements include death, and a decedent would never have been able to bring a wrongful death claim "had the decedent lived." ORS 30.020(1).

In this case, "the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." The decedent's claim would have been for loss of chance of recovery, as demonstrated by *Smith*. The fact that the adverse medical outcome in the claim brought by plaintiff is death, whereas, in a claim by the decedent, had he lived, the adverse medical outcome would have been something different, is immaterial to plaintiff's ability to bring the claim under ORS 30.075(1).

The radiology defendants' second argument continues where their first argument leaves off. They concede that, under their view of ORS 30.075(1), "*if* the complaint is read as alleging that [d]efendants' failure to diagnose decedent's allegedly damaged aorta resulted in a loss of chance to avoid pre-death *personal injury* [rather than death, which is the scenario they addressed in their first argument], then that claim would survive." (Emphases in radiology defendants' brief.) However, they contend that plaintiff could not recover any damages for that narrowed loss-of-chance claim, because "ORS 30.075(3) makes clear that damages for pre-death personal injury including 'disability, pain, suffering and loss of income' may only be recovered in an action for wrongful death if such an action is brought."

That argument rests on their understanding of the last sentence of ORS 30.075(3), which provides as follows:

"If an action for wrongful death under ORS 30.020 is brought, recovery of damages for disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting death of the decedent may only be recovered in the wrongful death action, and the provisions of subsection (2) of this section are not applicable to the recovery."

Defendants misconstrue the term "resulting" in that sentence. The purpose of the sentence is to prevent personal representatives from seeking what are really wrongful death damages—damages that occur between the injury that is the but-for cause of the decedent's death and the death itself—in survivorship claims. As we have explained, the wrongful death statute requires that the defendant's negligence was the but-for cause of the decedent's death. *Joshi*, 342 Or at 162. Given that causation standard, "damages for disability, pain, suffering and loss of income during the period between injury to the decedent *and the resulting death of the decedent*," ORS 30.075(3) (emphasis added), exist only when the decedent's death "results from"—is caused, in a but-for sense—by the defendant's negligence. *Joshi*, 342 Or at 162.

Thus, when the defendant's negligence injures the decedent and is the but-for cause of the decedent's death, damages that are suffered between the injury and the death may be recovered only in the wrongful death action. But if, as in a loss-of-chance-of-recovery case, the defendant's negligence injures the decedent but is *not* the but-for cause of the decedent's death, there is no "resulting death" of the decedent within the meaning of ORS 30.075(3), and the damages are not allocated to the wrongful death action—for the logical reason that, under those circumstances, a wrongful death action cannot succeed. *Joshi*, 342 Or at 162. Thus, we disagree with the radiology defendants' contention that ORS 30.075(3) would prevent plaintiff from recovering any damages on her claim for loss of chance of recovery.

We now turn to the ER defendants' argument. As noted above, they contend that any claim in which death

is an element must be brought under the wrongful death statute and, consequently, that plaintiff's claim here is distinguishable from the claim at issue in *Smith* because plaintiff's claim alleged the death of the decedent as an element, even though it was not the alleged injury. It is true, as they assert, that the Supreme Court has held, in cases interpreting the remedy clause of Article I, section 10, of the Oregon Constitution, that no common-law wrongful death action existed at common law. *See, e.g.*, *Storm v. McClung*, 334 Or 210, 222 n 4, 47 P3d 476 (2002) ("Since at least 1891, this court has adhered to the view that no right of action for wrongful death existed at common law.").

But that does not answer the question here, which is whether, in *Smith*, the Supreme Court recognized, or, in this case, we should recognize, a claim for medical negligence where the injury is the loss of chance of recovery and the adverse medical outcome suffered by the injured person is death, under today's common law of negligence. *See Smith*, 361 Or at 482 ("The fact is that, regardless of whether the legislature could have in the past or may in the future weigh in on this issue, this court is the forum for a case involving a common-law medical malpractice claim and * * * we are called on to decide common-law cases properly presented to us."); *see also id.* at 485 ("[L]oss of a substantial chance of a better medical outcome can be a cognizable injury in a common-law claim of medical malpractice in Oregon.").

Ultimately, *Smith* applies. The fact that, in this case, death is an element of the claim—but not the alleged injury—does not make this situation dispositively different from the situation in *Smith*. The wrongful death statute does not address claims like this one, where the injury is a loss of chance of recovery rather than death itself. *Joshi*, 342 Or at 164. Thus, the ER defendants' contention that the wrongful death statute precludes this claim is misplaced.

Nothing in *Smith* suggests that the court intended to exclude claims in which the adverse medical outcome was death from its recognition that "Oregon law permits a plaintiff who has suffered an adverse medical outcome resulting in physical harm to state a common-law medical negligence claim by alleging that the defendant negligently caused a

loss of his or her chance at recovery." 361 Or at 458. Some of the cases that the court discussed in *Smith*, including *Matsuyama v. Birnbaum*, 452 Mass 1, 890 NE 2d 819 (2008), on which the *Smith* court relied most heavily, involved death, rather than some other kind of adverse medical outcome, and the court did not distinguish those cases. *See, e.g.*, *Smith*, 361 Or at 467 (noting that, in *Hicks v. United States*, 368 F2d 626 (4th Cir 1966), "the court explained that a negligent doctor must answer for a patient's lost chance of survival"); *id.* at 471 (explaining that, in *Matsuyama*, "the Massachusetts Supreme Judicial Court engaged in a comprehensive analysis of the loss-of-chance theory" and "concluded that such claims should be cognizable"); *Matsuyama*, 452 Mass at 7, 890 NE 2d at 825 (noting that the decedent had died of gastric cancer). Although, in *Smith*, the court had no occasion to, and, thus, did not, specifically address a claim in which the adverse medical outcome was death, we perceive no reason to conclude that its holding did not encompass such claims.

It would be untenable for Oregon law to recognize claims for loss of chance of full recovery for plaintiffs who survived, but cut off those claims for plaintiffs who were, arguably, more severely harmed by being deprived of a chance of survival. That situation would offend, at least, the two basic principles of the tort system that the court addressed in *Smith* by preventing the tort system from operating in a rational way to "distribute the risk of injury to or among responsible parties" and by undercutting the "'prophylactic' factor of preventing future harm." *Smith*, 361 Or at 480. We do not believe that the court in *Smith* intended its holding to have that effect, and, as explained above, we perceive no other legal principle that would require that result.

For all of those reasons, we conclude that the trial court erred in dismissing plaintiff's claim for loss of chance of recovery.[5]

Reversed and remanded.

---

[5] We decline to address the radiology defendants' proffered alternative basis for affirmance, regarding the sufficiency of plaintiff's pleading of the loss-of-chance claim. On remand, the parties and the court will have the opportunity to address pleading issues.